AO 91 (Rev. 5/85) Criminal Complaint

# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA

UNITED STATES OF AMERICA

v.

Tony B. Pough
Timothy McQueen
Joseph B. Brunson

**CRIMINAL COMPLAINT**

CASE NUMBER: 3:08 MS16

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. On or about September 9, 2004 to May 21, 2007 in Richland County, in the District of South Carolina, the defendant(s) did: Attempt or conspire to commit any offense under Chapter 63 of Title 18, United States Code.

In violation Title 18, United States Code, Sections(s) 1349.
I further state that I am a(n) Special Agent, FBI and that this complaint is based on the following facts:
Official Title

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof: X Yes    No

_Signature of Complainant_

SWORN TO BEFORE ME AND SUBSCRIBED IN MY PRESENCE,

May 27, 2008    at    Columbia, South Carolina
Date                                     City and State

Joseph R. McCrorey, United States Magistrate Judge
Name & Title of Judicial Officer                Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

1. I, Ronald Grosse, am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), stationed in Columbia, South Carolina, and have been so employed for approximately eighteen years. I have conducted numerous investigations of various types of White Collar Crime, including the fraud commonly referred to as a Ponzi Scheme. The following information is based on my own knowledge and observations or that of other FBI Agents and law enforcement officers as stated.

### Case Initiation and Scheme Outline

2. In June 2007, the FBI opened an investigation of Tony Pough, Timothy McQueen, and Joseph Brunson, doing business as the Capital Consortium Group (CCG) and the Three Hebrew Boys (3HB). The federal case arose when the South Carolina Attorney General's Office (SCAG) provided information that Pough, Brunson, and McQueen were operating a high yield investment/debt elimination scam. Likewise, the SCAG investigation flowed from a related case pursued by the Office of the North Carolina Secretary of State. CCG was operating several different investment and/or debt elimination programs crossing state lines. CCG was based out of an office in Columbia.

3. CCG's primary claim was that it could satisfy an investor's debt (mortgage, auto, credit card, signature/student loan), provide monthly income (Long-Term and Short-Term/Christmas programs), or pay college tuition, all with extraordinarily high returns from investments in the Foreign Exchange Market (FOREX). CCG claimed _daily_ returns of between 200% and 500%.

4. CCG offered several debt elimination programs: the mortgage satisfaction, auto loan satisfaction, credit card satisfaction and signature loan satisfaction programs. Each of the programs required the victim to pay a fee, which increased with the amount of the debt. For example, the fee was $2,625 for a mortgage between $50,000 and $100,000, and $6,825 for a mortgage between $200,000 and $500,000. The victims were required to make their normal payments for 16 or 19 months after entering the program, at the conclusion of which CCG would pay off the remaining debt. CCG also offered a future mortgage or future auto purchase program, which operated like a high-dollar layaway program.

5. CCG also offered investment programs such as the Short-Term Program, the Long-Term Program, and the College Tuition Program. The Short-Term Program was also referred to as the Christmas Club Program. Money was invested which supposedly earned 10% per month

1

until the end of the year, at which time the investor received the entire balance. A 5% fee was charged up-front. The Long-Term Program allowed the victims to invest any amount, and after 91 business days, they received 10% of their investment every month for the rest of their lives. A 5% fee was also charged in this program. The College Tuition Program offered $100,000 toward four years of college tuition. The fees charged depended on what grade the student was in. If he was a high school freshman, for a $2,100 fee, he would receive $25,000 a year for four years of college.

6. The victims, or "constituents" as they were referred to by CCG, learned about CCG typically through word of mouth or by invitation to a seminar. CCG put on seminars in several states. Sometimes the three principals presented the CCG information; at other times, the seminars were run by people who were already in the program and had received specific training. These people were referred to as Independent Representatives (IRs). It was these IRs with whom the victims (constituents) dealt. The victims filled out paperwork provided by the IRs and submitted their fees to the IRs, who forwarded the checks and applications to CCG in Columbia.

### Official link between Tony Pough, Timothy McQueen, Joseph Brunson and 3HB/CCG

7. A review of the records of the South Carolina Secretary of State revealed that 3HB was formed as a limited liability company on 9/15/04, and its organizers were listed as Pough, McQueen and Brunson. CCG was also formed on 9/15/04 as an LLC using the same address as 3HB, 4039 Monticello Road, Columbia. The listed organizers are TMS Family Trust, Brunson Outreach, and Faith Ministries, the alter egos of Pough, Brunson, and McQueen, respectively. The addresses for those entities were boxes at commercial mailing facilities set up by the three men.

8. The main bank account into which the participants in CCG programs had their money deposited was at Bank of America in the name of Brunson Outreach/Capital Consortium Group. Three men had signature authority on that account: Tony Pough, Timothy McQueen, and Joseph Brunson.

### Early Fraud Schemes (CCG Precursors)

9. The principals of CCG were involved in several "money-making" schemes from which it appears they borrowed parts and applied them to the merging CCG programs. The following several paragraphs outline some of those schemes and highlight the parts adopted by CCG.

2

10. According to a victim I interviewed, Tony Pough held a previously advertised seminar in Union, South Carolina in 2000. Pough presented information about a few different programs, one of which was to repair credit. Pough also explained a program known as Will Trust in which an investment was tripled every four months. Part of the investment program had something to do with an investment in the foreign currency exchange market (FOREX), according to the victim. Pough claimed the programs were guaranteed.

11. The witness invested over $12,000 but never received any payments from Pough. Pough was promoting National Credit Repair (NCR), a program which claimed to be able to repair credit for a fee. The fraud perpetrated by NCR, a division of International Credit Repair (ICR) was that they claimed to have a computer disk which was able to search credit files and locate inaccurate information. The disk did not exist, and they took in several million dollars. The man behind ICR is a convicted felon. In 2003, after the Federal Trade Commission filed a complaint against NCR and ICR, they agreed to pay more than $1.5 million to their victims.

12. Another company Pough represented was JLR Enterprises, Ltd., or JLR Development. JLR was associated with Joseph Poteat. Poteat claimed to be a trader involved in trades through off-shore banks. He also told investors that he invested in foreign governments and their currency systems. Poteat was supposedly a Christian and emphasized the religious theme of the investment. He guaranteed returns of 40% to 50% per month. The organization was described as a private member organization (PMO). During a meeting held at 4039 Monticello Road (an office owned by Pough's mother and the eventual office of CCG) in 1999, Tony Pough introduced Poteat, who explained his investment programs. During this meeting, Pough described the FOREX as an off-shore investment system. On 8/10/06, Poteat was indicted by a Federal Grand Jury in Baltimore, Maryland, on charges of Mail Fraud and Money Laundering in connection with the IRS investigation of JLR Development, which was characterized as a Ponzi scheme. He pled guilty on 1/22/08.

12. Other schemes Pough promoted and collected fees in connection with were International Education Forum, LLC (IEF), WILLTRUST (WT), and the FOREX. The IEF was a Ponzi Scheme. WT was a fraudulent investment offering a "bank debenture program". It claimed to be able to turn $10,000 into $180,000 in one year by supposedly investing in trades that only have been available to the ultra wealthy. The trades were described as very secretive. Up to 10% commissions were paid to get people signed up. They claimed the traders employ strict non-disclosure, non-circumvention clauses in

3

their contracts, and the trading programs are conducted under the guidelines of the International Chamber of Commerce (ICC). The Securities Commissioner of Texas issued a Cease and Desist order against WT in April 2000.

13. Pough was further involved in a company known as Vision Financial Programs, LLC (VFP) which was formed in South Carolina in May 2002. Ray Lee Snell, one of the organizers of VFP was interviewed by me. He said that VFP was formed as a vehicle through which to invest in the FOREX. The investment was done through a company in Texas, Maximus Financial (MF). According to Snell, MF never paid the promised returns and was under investigation by the Texas Attorney General.

14. While it is believed that the 3HB incorporated aspects of some of the aforementioned scams in CCG, there were two other programs which seemed to have the greatest influence on the development of the CCG scam. The first such scheme – from which the 3HB drew a great deal of the CCG language, forms, promises and procedures – was known as Health and Wealth Co-op (H&W). H&W was run by Edward D. Fields of Sharpsburg, Kentucky. The program offered by H&W was called Monthly Profit Sharing for Life. The investors in the program were promised returns as high as 25% per month. An investigation by the Attorney General's Office in Kentucky determined that H&W was an illegal Ponzi scheme. Fields and two others were indicted in November 2006 for defrauding investors of over $4 million.

15. Earl Graham of Columbia was interviewed about H&W. Graham knew Tim McQueen for years. Sometime in 2003 or 2004, McQueen was down on his luck and wanted to know what Graham did to make a living. Graham had been working for H&W and told McQueen about it. McQueen became a representative for H&W. McQueen brought Joe Brunson and Tony Pough into the program. Graham quit H&W and later found out McQueen, Pough, and Brunson had started their own program. Graham heard they had a trader investing in some type of high-yield investment program.

16. The similarities between H&W and CCG are many. The forms used by the 3HB when they worked with H&W are almost identical to many of those incorporated in the CCG program. H&W claimed they had a trader who invested in foreign securities; CCG claimed to invest in the FOREX. H&W claimed returns of 25% per month; CCG promised returns of 10% a month in their Long-Term program. Both of these programs offered a "residual for life." Payments under H&W were supposedly made after a 90-day waiting period, while CCG's program had a 91 business day waiting period. Similar certificates were sent to investors reflecting the investment they made. Fields

4

claimed that he was investing in "the foreign market."

17. The other program which had considerable influence on the development of CCG's programs was known as Success Training, Inc. (STI). STI was a nationwide mortgage debt elimination scheme which purported to be able to pay off existing mortgages for a fee. This was done through the use of trusts and claims that the mortgage loans were fraudulent. The STI program was associated with the Dorean Group out of San Francisco. One of the representatives of STI and The Dorean Group, William Julian, of Cayce, South Carolina, spoke at an STI/3HB seminar in February 2005. The 3HB collected fees from victims for the STI program and deposited them in bank accounts under their control. Julian, Kurt Johnson, and Scott Heineman were indicted in San Francisco and convicted of numerous fraud charges. The 3HB used portions of the mortgage elimination program offered by STI in the CCG mortgage satisfaction program. STI also offered an auto loan elimination program which CCG later adopted.

## Comparison between CCG and Characteristics of classic Ponzi Scheme

18. A Ponzi Scheme is financial fraud named after Charles Ponzi, an Italian immigrant who, in 1920, perpetrated a massive fraud on the citizens of Boston, Massachusetts. Ponzi claimed to be able to make huge returns, up to 400% on the purchase and sale of international postal reply coupons. He promised returns of 50% in forty-five days to investors. Ponzi took in millions of dollars and was initially able to make payments, which ensured the reinvestment of "profits" and encouraged new investments. The payments he made were from the deposits of new investors and not profits made as represented. Ponzi lied about the purchase and sale of the coupons and the potential for profit. The scheme fell apart, and he was indicted and convicted.

19. The CCG plan, like Ponzi's, was destined to fail for many reasons and is a fraud. The CCG operation had all the characteristics of a classic Ponzi Scheme (PS). The characteristics listed in paragraphs number 22 through 34 below were derived from my experience, past investigations, and research.

**20. In a PS, the earliest investors are paid exceptional returns from the deposits of the growing number of investors. The profits are not created by the success of the underlying business but instead derived fraudulently from the capital contributions of other investors. There is no underlying business and the source of revenue is the investment pool.** CCG had no source of income apart

5

from what was contributed by the investors. I have reviewed the CCG bank accounts at Bank of America from September 2004 to April 2007 and First Citizens Bank from April through May 2007 and have found no deposits from income generating sources, particularly the FOREX market, in which CCG claimed to be investing. The only deposits made to CCG's business accounts were investments from newly recruited investors or older investors contributing new money into the CCG programs.

21. Further, I talked to a confidential source who is close to the three principals of CCG and has known and/or worked with them for at least a year, and is very familiar with their business. The confidential source told me that in the time he/she has known Pough, McQueen, and Brunson, she/he has not known them to have a source of income other than the fees paid to CCG by clients. There is no evidence of funds being used for the trading of foreign currencies. During all CCG presentations, potential victims were told that CCG makes the profits from which they fund their programs through investments in the FOREX. As a part of the investigation, the Commodities Futures Trade Commission (CFTC) was contacted and asked for assistance. The CFTC is the government agency charged with the regulation of commodity futures and options markets in the United States. Part of the CFTC mission is to regulate the foreign currency exchange market. Foreign currency is traded on exchanges that are regulated by the CFTC in Chicago and New York. Foreign currency can also be traded in the "off exchange" market. The CFTC does not regulate the brokers in this market but individuals who trade in this market have to do so through entities that are regulated. Entities that participate in the purchase and sale of any commodity for future delivery are known as Futures Commission Merchants (FCM). The FCMs in the United States are subject to regulation by the CFTC. In May 2007, the CFTC was asked to query the FCMs, of which there are about three hundred, for information pertaining to accounts in the names of Pough, McQueen, Brunson and their associated companies. The CFTC found that from 2004 through 2007, there were several accounts opened individually by the three subjects and a couple in the names of businesses, none of which were in the name of CCG. The total amount invested was less than $40,000 in all the accounts, and collectively they lost money in the few trades that were made.

22. **Extraordinary percentages can be promised and paid out of the investor's own funds over time before their own money is gone.** An investor who put money into the CCG Long-Term Program waited 91 business days, or roughly four and a half months before they got their first 10% payment. This meant that if a victim put $10,000 in the program, CCG could pay him out of his own money for 14 months from the initial deposit. The Satisfaction Programs

6

required a wait of at least 12 months (Credit Card program) to 19 months (Future Mortgage) before payments had to be made. This delayed the ultimate collapse of the investment scheme, and as money started to get paid out, it furthered the impression that CCG's claimed investments were real.

**23. Any shortfall can be covered by new investors, thus extending the scheme.** CCG experienced exponential growth in its membership through positive word-of-mouth and regularly-held seminars. An analysis of the participants reveals the number of investors increased from 223 in 2005 to over 7000 in the first five months of 2007. The fees taken in provided excess funds from which to pay early obligations. In the first five months of 2007, CCG took in more money in fees (over $40 million) than they had from the previous two years combined.

**24. PSs are often a form of Affinity Fraud which refers to investment scams that prey upon members of identifiable groups, such as religious or ethnic communities, the elderly, or professional groups. The fraudsters who promote affinity scams frequently are, or pretend to be, members of the group. They often enlist respected community or religious leaders from within the group to spread the word about the scheme. These scams exploit the trust and friendship that exist in groups of people who have something in common.** The 3HB/CCG operation was a classic Affinity Fraud. The 3HB claimed to be pastors. They claimed that CCG was a ministry interested in freeing its clients from the bondage of debt. Many of the IRs were active or retired members of the US Army. The religious and military affiliations engendered a high degree of trust in CCG.

**25. The indebtedness in PSs increases as a function of geometric progression; however, the enterprise generates "income" as long as the pool of investment capital increases faster than the debt payments.** The indebtedness progressively increased with the signing up of each new constituent. Every dollar invested in the Long-Term Program was guaranteed to produce a 120% annual return for the rest of the investor's life. Every dollar invested in the Satisfaction Programs book marked a return of at least 850% in 16 months. While the long term debt accrued, the amount of money contributed to the scheme was sufficiently high to cover the short-term obligations of the scheme.

**26. A PS is illegal for many reasons, including that its collapse is mathematically inevitable.** A simple example of this is that in the Mortgage Satisfaction Program a $1,500 fee would pay off a

$50,000 mortgage in 16 months. With no income-generating enterprise or investment, CCG would have to recruit 33 constituents paying $1,500 each just to pay that mortgage when it came due. If each of those wanted a $50,0000 mortgage paid off, that would require $1.65 million over 16 months and the recruitment of 1,100 more "investors."

27. **It is insolvent from the moment of its inception and becomes increasingly insolvent each day of its operation. From day one, its liabilities exceed its assets.** An examination of the computerized records of CCG revealed that in 2007, CCG was obligated to pay out over $200 million, but it only had $17 million in the bank on May 21, 2007. Without taking on any new constituents after May 2007, CCG was obligated to pay almost $800 million to satisfy constituents in 2008. At the time the SCAG froze its accounts, CCG was obligated to pay over $1 billion in debts.

28. **Most PSs appear to be very successful, and early investors are satisfied, until the schemes collapse on their own or, as in this case, the structural impracticality is discovered and the government shuts them down.** In this case CCG did pay its early debts until the SCAG froze CCG's accounts; however, a financial analysis conducted on the records of the company revealed that its assets were inadequate to cover all of its obligations, and it had not invested the contributions in a way to promise any kind of return, much less the extraordinary returns promised.

29. **PSs often make claims about what they are not.** During the course of this investigation, I have obtained copies of the PowerPoint presentation used by CCG. A particular slide included in the presentation states, "We are NOT...Gone Tomorrow! And Here Today." Bullet points under "We are NOT..." include "An Investment Scheme", "A Pyramid Group", and "A Ponzi Group."

30. **The return on investment (ROI) is always greater than the alleged revenue source normally returns.** The guarantee of 120% per month for life in the Long-Term program and returns in the thousands of percent in the Satisfaction Programs exceed guaranteed returns for any known investment plan, and certainly exceed what can be guaranteed through the FOREX market, which is a very volatile and specialized market.

31. **PSs are typically secretive about the way they generate returns.** CCG told constituents it used "sweep accounts" to "deposit" money in the FOREX, but refused to provide details about

8

the "traders" or brokers they used or the mechanics of their investments. They enforced secrecy among their clients by having them sign non-disclosure agreements and claiming they were subject to a $1 million fine if they disclosed the contents of the programs. I have obtained copies of blank non-disclosure agreements included in the CCG presentation containing these draconian terms.

32. **The stated investment is generally obscure enough to mask it from initial comparative scrutiny, and once payouts are made, this lessens the subsequent level of scrutiny from investors as word-of-mouth and experience trump mechanics.** CCG claimed to use the FOREX in part because this is a somewhat obscure commodities markets in which its investors would have little knowledge or experience.

33. **The regular payment of returns induces investors to bring friends, family, and colleagues into the scheme and to put up additional funds themselves once they are convinced of its veracity. New recruits are typically found by word-of-mouth.** News of the CCG programs spread quickly through the military and church community. The early investors recruited their family members and fellow soldiers and co-workers. The largest single victim occupation category was the US Army. There were a number of people employed by the US Bureau of Prisons because a couple of the IRs worked in prisons.

34. The scheme to defraud perpetrated by Tim McQueen, Tony Pough, and Joseph Brunson was destined to fail from the moment the first fee was taken in and, contrary to their representations, investor money was not placed into a FOREX account or any other account with the possibility of the promised returns of between 200% and 500% per night. They did not open a sweep account until July 2006 - a year and a half after they started business - and that account earned under 5% per year.

## Financial Analysis

35. During a search warrant executed by the South Carolina Law Enforcement Division (SLED) at the office of CCG on June 15, 2007, several computers and external storage drives were seized, along with a limited number of documents. A thumb drive was found which contained an Excel spreadsheet listing the CCG constituents, their addresses, and CCG program participation information. Their own records reflected that about 7,000 victims had invested approximately $80 million in over 14,000 individual programs.

36. Financial information was derived from the aforementioned

9

spreadsheet and bank records obtained through the Grand Jury investigation. I believe that the CCG records are not complete and the analysis I conducted was based on financial information that understates the amount of money taken in and fraudulently expended. The "constituent list" obtained during the SCAG search of the CCG headquarters revealed the incredible increase in program applications as word of CCG spread. The numbers rose from 223 in 2005 to over 7000 in the first five months of 2007. The fees taken in similarly exploded. In the first five months of 2007, CCG took in more money in fees (over $40 million) than they had from the previous two years combined.

37. An analysis of CCG's own records shows that they would have collapsed in 2007. That year they were obligated to pay out $200,928,311 to satisfy the debts and investment returns of their victims. The average fee in 2007 was $5,704. At that rate, CCG would have had to recruit 35,225 people to stay alive. By 2010, assuming no new debt had accrued after 5/21/07, CCG would have had to recruit 195,120 people (who would have had their own debts that would need to be eventually satisfied).

38. A review of the Bank of America and First Citizens bank accounts into which the victim's money was deposited, exhibited that they did pay debts, but the bulk of the money (over 65%) went to keeping the operation going and to paying themselves and their IRs.

39. Instead of investing victims' money as promised, Pough, McQueen, and Brunson used the majority of the money to purchase assets for their own personal benefit. As part of my investigation, I have discovered (1) real estate purchases in Panama as well as other overseas investments, (2) at least twenty high-end vehicles for personal use, (3) a luxury motor coach valued at approximately $1 million, (4) condominiums in Atlanta, Georgia, (5) a personal jet worth about $5 million (6) suites at the Georgia Dome and Bank of America Stadium (Carolina Panthers) in the names of entities established by the principals, and (7) season tickets for the Atlanta Falcons and Carolina Panthers. All of these purchases were made with investors' money. Sometimes purchases were made directly from the main deposit accounts, but the three subjects also transferred millions of dollars to bank accounts in various names which were under their control. Asset purchases were made from those "down-stream" accounts.

### Violations of Federal Criminal Statutes

40. The money paid by victims to CCG in Columbia was almost without exception sent to them in the form of cashier's checks by

10

private or commercial interstate carrier. The checks were for varying amounts but well over one thousand were in excess of $5,000. CCG sent the victims certificates reflecting their participation in the CCG programs and other documents by UPS or other commercial carrier, or the through the United States Mails in violation of Title 18, U.S. Code, Section 1341. They further sent all of the payments to victims by commercial carrier as well. All three, Brunson, McQueen, and Pough signed certificates. The three men conspired to commit an offense under chapter 63 of Title 18, United States Code, in particular, the Mail Fraud statute, which is a violation of Title 18, United States Code, Section 1349, Attempt and Conspiracy. Following are examples of the use of commercial interstate carriers and the United States Mails in this case.

(a) On January 19, 2007, Paul and Yulonda Kent sent by UPS, a commercial interstate commercial carrier, a $31,500 cashier's check payable to CCG for their participation in the Long-Term program. The package containing the check was sent from Columbus, Georgia to CCG at the UPS Store located at 1013 Broad River Road. Kent provided me with a copy of the UPS shipping receipt.

(b) On or about March 15, 2007, Ronald W. McDougald received in the United States Mail a package from CCG containing the CCG certificate detailing McDougald's participation in the Mortgage Satisfaction program. McDougald provided me with a copy of the envelope sent by CCG.

41. It is my belief based on the foregoing information and other evidence, that Tony B. Pough, Timothy McQueen and Joseph B. Brunson violated Title 18, United States Code, section 1349, Attempt and Conspiracy.

_____
Ronald Grosse, Special Agent, FBI

Sworn to and subscribed before me
this 27th day of May, 2008.

_____
Joseph R. McCrorey, United States Magistrate Judge

11